## Case No. 1,829.

### The BREEZE.

[6 Ben. 14; 6 Am. Law Rev. 762.][1]

Circuit Court, S. D. New York. April, 1872.

COLLISION IN EAST RIVER — INSCRUTABLE FAULT.

1. Where two schooners came in collision in the East river in the daytime, and the court, on considering the evidence, was unable to determine in what way the collision was caused, *held*, that the case was one of inscrutable fault, and that the libel must be dismissed.

[Cited in The Worthington and Davis, 19 Fed. 839; The Max Morris, 28 Fed. 884.]
[See The Scioto, Case No. 12,508.]

2. The libellant in a collision case must establish fault on the part of the opposing vessel causing the collision, or he can recover nothing.

[Cited in The Alhambra, 33 Fed. 77; The Kallisto, Case No. 7,600.]

In admiralty.

Beebe, Donohue & Cooke, for libellants.
C. H. Woodruff, for claimants.

BLATCHFORD, District Judge. This libel is filed by the owners of the schooner David Hazard to recover for the damages sustained by them in consequence of a collision which took place between that vessel and the schooner Breeze, in the East river, between New York and Brooklyn, shortly after noon, on the 28th of October, 1868, as the result of which the David Hazard was sunk, with her cargo. The David Hazard had come around the Battery, from the North river, and was bound to the Wallabout. The Breeze had come through Buttermilk channel between Governor's Island and Brooklyn.

The story of the libel is, that the David Hazard had turned the Battery into the East river; that the wind was blowing fresh from "the westerly," and about directly up the East river; that it was the first quarter of the flood tide; that the David Hazard had set, at the time, only a double-reefed mainsail and a jib, and her boom was off to port; that, after she had fairly reached the

[1] [Reported by Robert D. Benedict, Esq., and here reprinted by permission. 6 Am. Law Rev. 762, contains only a partial report.]

East river, the Breeze was seen astern, and on a course off the starboard side of the David Hazard, having a jib, foresail, mainsail and main gaff topsail set, and her booms off to starboard, sailing at a much greater rate of speed than the David Hazard, and bound the same way; that, when the David Hazard had reached a point off, or nearly off, pier 8, East river, and about one-fourth of the distance from the New York shore to the Brooklyn shore, and was keeping on her course, under a steady helm, she was overtaken by the Breeze, and was passed by her at the distance of about one-half of the length of the Breeze off; and that, when the Breeze had passed partly ahead of, and beyond the David Hazard, she suddenly changed her course to port, and across the bows of the David Hazard, and, in her course, struck the bowsprit of the David Hazard a violent blow, breaking off the bowsprit and splitting her open forward, so that she filled and sank. The libel avers, that the collision happened by the carelessness and want of skill of those navigating the Breeze, in, among other things, carrying too much canvas, and passing in such close proximity to the David Hazard, and then suddenly changing her course and attempting to cross the bows of the David Hazard; that the David Hazard kept steadily on her course; and that the change of the course of the Breeze was too sudden and too near for those on board of the David Hazard to avoid a collision.

From a perusal of the answer, it would hardly be supposed that it was attempting to describe the same collision that is referred to in the libel. It alleges, that, until the Breeze reached the East river (she having come from Amboy, New Jersey), the wind had been about west by north; that, about that time, a slight squall came up from the west; that, as the Breeze entered the East river, on the Brooklyn side, a fleet of vessels was bound up the river, between the Breeze and the New York shore; that her master, in view of the squall, and of his having an errand in New York, concluded to anchor; that the Breeze kept on her course, to let such fleet get out of her way, they outsailing her; that, when the Breeze was about opposite the foot of Wall street, the way being clear, her master, in order to lower his sails in safety and come to anchor, put his helm down and brought the vessel around into the wind, and lowered all his sails except the foresail, and headed down the river and towards the New York shore, until some distance below Wall street, when he put his helm about amidships, and headed about on to the New York docks, and prepared to anchor; that the Hazard was not in sight until some time after the Breeze had come around, and when the Breeze was preparing to anchor; that the Hazard was then to windward, near the Battery and heading about east, the course of the Breeze

being, at that time, about northwest; that, if the Hazard had kept on her course, she would have cleared the Breeze and passed astern; that, instead of keeping to windward, she changed her course and headed on to the Breeze; that, when this was discovered, the helm of the Breeze had been placed amidships, and her foresail had been partially lowered preparatory to anchoring, and the Hazard was about a length off; that the master of the Breeze immediately put his helm up, but before the vessel answered it, the bowsprit of the Hazard struck the side of the cabin of the Breeze about twelve feet forward of her stern, driving the cabin forward, breaking the rail, and otherwise seriously injuring the Breeze; that the force of the blow knocked the Breeze around, so that she payed off on the other stretch; and that the Hazard then slid off and went on up the river and sank.

The mass of contradictory and incomprehensible evidence in this case is such as to make it impossible to arrive at any entirely satisfactory conclusion as to the real facts. Some points, however, are well established. The marks of the collision left on the Breeze show certain things both affirmatively and negatively. There was a break on her port rail, about twelve feet forward of her stern. The space between her port rail and the port side of her house was about two feet. There was a dent in the port side of her house, made by the end of the bowsprit of the Hazard, at a point about three feet forward of the place where the port rail was broken. The blow angled forward in direction. The after part of the dent in the side of the house was deeper than its forward part. The house was shoved forward as well as to starboard. On these facts the claimants insist, and correctly, that, at the moment of the blow, there was an angle of 34 degrees between the forward directions of the two vessels.

The theory of the libel is, that the Breeze outsailed and overtook the Hazard, and passed her, being to the starboard, and then suddenly changed her course to port, across the bows of the Hazard, and, in so doing, struck the bowsprit of the Hazard. How this could have been, consistently with the condition of the marks left on the Breeze, and with the results of the blow upon her, it is impossible to imagine. For the collision to have occurred in the manner set forth in the libel, requires that the house on the Breeze should have been shoved astern instead of forward. I deem it impossible that the collision could have occurred by the passage of the Breeze across the bows of the Hazard, as claimed in the libel.

On the other hand, according to the answer, when the Breeze was heading northwest and the Hazard was heading east, so that, if the Hazard had struck the Breeze, in their then respective courses, the direction of the blow would have angled aft on the Breeze 45 degrees, the Hazard changed her course seven points, passing by the Breeze, and making a turn, so that she approached the Breeze from aft, and the direction of the blow angled forward on the Breeze 34 degrees. If, as the answer claims, the Breeze remained heading northwest, this would make the Hazard, at the time of the blow, head north by east. If the Breeze, heading northwest, was in the wind, then the Hazard, which, when heading east, was sailing with the wind four points abaft her beam, on her port side, and had, according to the evidence, her boom off to port, must have come around seven points towards the wind, and to within five points of the wind—an operation which would certainly have caused her boom to gybe over to starboard, which, on the proof, it never did. Moreover, the story of the answer makes the Hazard go through the most extraordinary manoeuvre, of leaving her proper course, which was east, and turning seven points towards the wind and towards the Breeze, apparently for the sole purpose of hitting the Breeze. It is impossible to believe that the collision occurred in the manner stated in the answer.

Yet the collision did occur. It happened in broad daylight, when there was no reason why each vessel should not have seen the movements of the other, and when there were no circumstances to make the case one of inevitable accident, and when the collision must have been caused by fault on the part of both vessels or of one of them. I cannot determine, from the proofs, whether there was fault in both vessels or in only one of them, or what specific fault there was on the part of either. Certain it is, that the libellants have failed, by satisfactory evidence, to maintain the account of the occurrence given in the libel, and to show that the collision happened through any fault on the part of the Breeze.

I am free to say that the case is one, in my opinion, of inscrutable fault. In that view the point has not escaped attention, although not discussed by counsel, that the libellants may urge, on the strength of certain observations in text writers and in reported cases, that the damages sustained by the vessels ought to be equally divided between them. I have examined the authorities on the subject. The question is not settled for this court, and I am free to adopt what I believe to be the proper rule, namely, that, where the libellant does not establish fault in the vessel sued, such vessel must be allowed to depart from court without being mulcted in any amount, no matter whether the court concludes that the collision was the result of inevitable accident, or of some fault that is inscrutable; and that it is only where the vessel sued is affirmatively and specifically held to be in fault, either solely or jointly with some other vessel, that she can be condemned in any damages. I cannot yield assent to the proposition, that a

party can bring another into court, and, without establishing against him the cause of action alleged, depart with a portion, at least, of the fruits of a successful litigation. I forbear to discuss this question at length, or to cite the authorities on the subject.

The libel must be dismissed, but, under the peculiar circumstances of the case, I shall impose no costs on the libellants.