## Case No. 7,600.

### The KALLISTO.

### PETTITT et al. v. The KALLISTO.

[2 Hughes, 128.] [1]

District Court, E. D. Virginia. Sept. 28, 1877.

COLLISION—LOOKOUT—BURDEN OF PROOF—DOUBT AS TO FAULT.

1. No fixed position is established by law as the place where the lookout must be in the forward part of a vessel under way.

2. If the master of the watch does not place the lookout in position, he has some discretion in regard to it; but he must be well forward, where his vision is open and free over each bow and ahead of the vessel.

[Cited in The R. R. Kirkland, 48 Fed. 762.]

3. The burden of proof is upon the libellant for collision, to establish fault upon the libelled vessel.

4. Where there is a reasonable doubt as to which vessel was in fault, the loss must remain where it has fallen.

[Cited in The Worthington and Davis, 19 Fed. 839.]

[These were libels in the matter of the Kallisto and by C. A. Pettitt and others against the Kallisto for damages sustained in a collision.]

The Norwegian bark Kallisto, 460 tons, and the American schooner Hattie L. Fuller, 260 tons, collided at 3 a. m. on the morning of April 13th, 1877, at sea, about eighteen miles northeastwardly off Body Island, the light there being in sight. The Fuller was bound for Washington, D. C., with a load of hard pine lumber. The bark was in ballast bound for Bull River, South Carolina. The schooner was struck in the port below, a little forward of the cathead, about six feet from the stem. Her bowsprit was broken off, that and her jib-boom carried away, her hull cut into about the width of the Kallisto's bow, her timbers broken through as well as her plankshear, covering boards, and deck beams, her windlass-bits broken, and her windlass and topgallant forecastle capsized. She was struck below the water and became in a few hours waterlogged, and at about 6 a. m. of the 13th April, was abandoned by her crew and proved a total loss. At the time of the collision there was a stiff topgallant breeze from nearly due east. The bark was under full sail on a port tack closehauled full and by the wind, on a course south by east three-quarters of a point east. The schooner was on a starboard tack under full sail close by the wind, on a course north by west. The bark had her sidelights up burning brightly. The evidence leaves it doubtful whether the lights of the schooner were burning just before the collision, but makes it clear that her sidelight lan-

¹ [Reported by Hon. Robert W. Hughes, District Judge, and here reprinted by permission.]

terns were up in their proper places in the rigging. The master and two seamen constituted the watch on the schooner at the time of the collision. The first mate and four seamen constituted the watch on the bark at that time. The crew of the schooner was seven men in all; that of the bark twelve men in all. The schooner was nearly new, staunch and strong. The schooner had been on the starboard tack all night, her helmsman having instructions to hold her close to the wind so as to keep as far as possible off shore. Before and at the time of the collision the schooner's lookout was at his proper place, and was not in fault on that score. A good deal of evidence was produced by the libellants tending to throw doubt upon the question whether or not the bark's lookout was at the proper place on the bark. He was on top of the forward house sitting or standing. All the sails of the schooner except foretopsail were up, and she was going at the rate of about six or seven knots an hour. All the sails of the bark were up, and she was going at the rate of seven or eight knots an hour. There was no moon; the sky was hazy, rather dark, and a little overcast with clouds, but it was not too dark to see vessels under sail at a quarter to half a mile off. Bright lights might be seen as far as three or four miles off. The sheets of the schooner were trimmed flat aft, which made it more or less difficult to see her from any point ahead or nearly ahead. About three or four minutes before the collision the schooner's lookout saw a red light between one and a quarter and one and a half points on the port bow. As soon as he saw it he sang out, "A light on the lee bow!" No notice was taken by the Fuller's master (whose watch it was) of this signal, and in about three minutes more the lookout sang out again to the same effect. This was too late to prevent the collision, and the schooner's captain confirms the testimony of his lookout and helmsman, that he gave no orders for the emergency, either four minutes before or at the time of the collision. The helmsman of the schooner testifies that on hearing the first and second cry of the lookout he held his helm hard aport. About a minute before the collision and when too late to avoid it the lookout on the bark saw the schooner's sails, but saw no light. No man on the watch of the bark, according to the evidence of the bark's crew, saw any lights in the rigging of the schooner until some time after the collision; and no light at all, except that one or two of them saw a dim white light, which they thought might have been the skylight. When the lookout of the bark saw the schooner's sails, about a minute before the collision, he cried out, "A sail ahead!" The mate then saw the schooner on the starboard bow. The helm of the bark had been before the collision and was afterwards held hard up or aport. The vessels came together "nearly end on," "a little at an angle," "about two points from a direct line," each being

struck on the port bow; the bark about three feet from the stem, the schooner forward of the catheads. The bark was damaged by the collision in her port bow. She was also damaged on her starboard side, the schooner having after coming into her, slewed around against her after the collision; but the injury was not great, and was repaired at a cost of $500 on the vessel being brought into Norfolk. The wife and two daughters of the captain of the schooner were taken at once on board the Kallisto, and about three hours after the collision the crew also were taken on the bark, after the schooner had been abandoned and left to her fate. The schooner was three and a half years old, stanch and strong, worth some $18,000; net freight, $1,200; insurance on cargo, $2,505; all making a total of $21,705. The appraisement of the bark is $12,000, but is much lower than her real value, because she cannot be registered in this country under the present protective laws of registration.

The following is the substance of the evidence of William Wesley Davis, the schooner's helmsman at the time of the collision: A sailor; been going to sea two years; took wheel at 2 o'clock a. m.; had orders, to steer north by east if she would go it; steered north by east; sheets trimmed flat aft; wind east-northeast; heard the lookout report a light on lee bow; did not hear the color of the light; heard him report the light twice; captain was forward on the lee or port side of the cabin; saw the captain; received no orders from him; about four minutes elapsed between the time the light was first reported and the collision; captain of the schooner, Smith, did nothing after the first report of a light ahead.—nothing before the collision; after the collision the schooner slewed around, her port side to the bark's starboard side.

W. H. C. Ellis, for libellants, submitted with numerous others, the following points and references: The lookout of the bark did not see the lights of the schooner, and therefore did not report them, so that the bark could port her helm, according to the rules of the road of the sea, in time to pass the schooner on her port side, under her stern, as the rules of navigation require. The want of a sufficient lookout, stationed in a proper place, so far as this case can be reached by human knowledge, was the whole and sole cause of the collision. The moment he reported a vessel, whose sails he saw because they were so high from the place where he was sitting when the mate left him, the bark did port her helm, but too late to avoid the collision. The bark ported her helm because she was on the port tack and the mate saw that the schooner was on her starboard tack closehauled. This was proper, but it was done too late. It was done too late, because the lookout was in a position where he could not see the schooner's lights, and knowing that he could not see from that place, he

was not trying to see. If the lookout of the bark had done the same as the schooner's lookout there most certainly would have been no collision. If the schooner's lookout had reported the bark's light on the lee bow at the distance of two or three miles, the schooner, by the rules of navigation, was compelled to keep her course, and the bark's duty was to port her helm in time to pass under the schooner's stern. Instead of the schooner having altered her course just before the collision, and then having a free wind, as to which there is not a word of evidence on the part of the respondent's witnesses except crude speculations that have not even the merit of plausibility, the logbook of the Kallisto shows that she must have had a free wind, although such a state of things is not essential to the case of the schooner. It states the wind to be east, and that the bark headed a south-southeast course, which would have made her closehauled, and her leeway, according to the evidence would have been from a point to a point and a half. But according to the logbook she made no leeway, but made her compass course of S. S. E. "good." To have made her compass course "good" the wind must have been where the schooner's crew and also Captain Stoddard say it was at the time, that is, E. N. E., and not east, free from her on that course.

Lookouts.—Chamberlain v. Ward, 21 How. [62 U. S.] 570, 571. New York & B. Transp. Co. v. Philadelphia & S. Steam Nav. Co., 22 How. [63 U. S.] 471 (last case only cites first case. See first case particularly); Whitridge v. Dill, 23 How. [64 U. S.] 451. As to schooner changing her course suddenly so as to throw stem of bark into her port bow. Haney v. Baltimore Steam Packet Co., Id. 287, 291, 293 (this is like our case in some respects); The Ottawa, 3 Wall. [70 U. S.] 273; The Hippodrome, 6 Wall. [73 U. S.] 216; The Ariadne, 13 Wall. [80 U. S.] 478. See, also, The Emily [Case No. 4,453]; The Blossom [Id. 1,564]; The Rebecca [Id. 11,618]; The Clement [Id. 2,879]; The Chester, 3 Hagg. Adm. 316. But it has been held not improper conduct on the part of the officer of the deck to take the helm himself and to trust the lookout to a common sailor. The Blossom, supra. But if the collision is not owing to an insufficient watch, the vessel will not be considered at fault. Mellon v. Smith, 2 E. D. Smith, 462. The lookout must be stationed in "forward" part of ship, in place best adapted to descry vessels at the earliest moment. This is indispensable to exempt colliding vessel from blame. St. John v. Paine, 10 How. [51 U. S.] 557; Newton v. Stebbins, Id. 586. See Taney, dissenting, in Haney v. Baltimore Steam Packet Co., supra.

Sailing Rules.—If ships are approaching each other, the one going free must get out of the way of the one that is closehauled. If both are closehauled, each must go to the right; or the ship on the starboard tack keeps on, while the ship on the port tack

changes her course. When there is the least doubt of their going clear the ship on the starboard tack is to persevere in her course, while that on the larboard is to "bear up" or keep more away from the wind. When both are going by the wind the vessel on the starboard tack shall keep her wind, and the one on the larboard tack bear up, thereby passing each other on the larboard hand. When both vessels have the wind large or abeam and meet, they shall pass each other in the same way. In both cases the helm must be ported; and it is the duty of the vessel on the larboard tack to give way at once, without considering whether the other vessel be one or two points to the leeward. 1 Pars. Mar. Law, 195, 196, and notes citing authorities. Dix. Shipp. §§ 710–710. It was held in The Ann and Mary, 2 W. Rob. Adm. 189, that in doubtful circumstances and where there is a probability of collision, a vessel on the larboard, although close-hauled, is bound to give way to a vessel on the starboard tack, notwithstanding the latter may have the wind free. This is not the case by our act but in this case we are to be governed by the general admiralty law. See The Scotia, 14 Wall. [81 U. S.] 170. A vessel may put her helm to starboard or to port as the case may be, when the collision is inevitable, to ease the blow; although this would not be the proper course to pursue before the collision became inevitable. 1 Pars. Shipp. & Adm. 581, and note 1, citing numerous authorities. The Ottawa, 3 Wall. [70 U. S.] 274.

Weight of Testimony and Rules of Evidence.—Admissions of the mate and crew are not evidence against the owners unless made at the time of the collision, so as to form part of the res gestae (1 Pars. Shipp. & Adm. 537, and notes 3, 4); and even then they have but little weight in opposition to their deliberate testimony as to the facts. But the "testimony of men on board their own vessel respecting their own acts receives greater credit than the testimony of men on the other vessel." (Id. 538, and note 4.) 2 Brightly, Fed. Dig. p. 261, § 125. "But little reliance seems to be placed on witnesses' estimates of times and distances at the time of a collision." (1 Pars. Shipp. & Adm. 538, note 1.) Number of witnesses. Section 126. And a witness cannot be impeached as to what he has sworn to by proof of what he said before (Experts, § 127), unless he was asked about the matter when examined, etc. Unis v. Charlton's Adm'r, 12 Grat. 484, and other authorities cited by Judge Hughes in case of The J. W. Everman, Case No. 7,591. In this case the contradicting witness was present when the schooner's helmsman and others were examined.

Charles Sharp, for respondents, presented, amongst many others, the following points and references:

The Kallisto, bound to South Carolina in ballast; nearly all sails set; fresh topgallant breeze; night dark, cloudy, slightly hazy; splendidly handled by first mate, a most careful and accomplished young officer (see how rapidly he rose in his profession, and in Norway there are boards of examiners, as in navy); admirably manned; watches large and full; "able seamen at helm and on lookout" during the collision hour; extra seamen always on deck; one (M. Peterson) actually on the forecastle deck for one whole minute, waiting to relieve the lookout, who was then engaged in sighting the schooner (two lookouts at that moment, thus disposing of the question of improper place); mate constantly walking the deck, and actually sighting vessels during his watch, and actually saw this schooner when reported, with no red light before the collision, and he and his helmsman being two lookouts aft (Stoddard approves of one lookout aft in the officer of the deck, when lookout is stationed in some place not so good as forecastle deck); and the forward house being by overwhelming testimony good for a lookout except abaft the forward house, up to which point officer of deck and helmsman look out; and no man testifying to any delinquency on the part of any man on the bark; and no plan discovered by counsel in all that vast volume of bark's testimony, except about our lookout standing or sitting, which is insignificant (St. Mark and St. Luke, differ far more than that). The bark's watch were all doing their duty skillfully and carefully. Under these circumstances and at the darkest hour, just before morning, bark meets (under 16th rule) a schooner in command of a wretched specimen of a master and a poor crew, who had been up in bad weather for nearly a week, stumbling along the course, keeping no log, making no calculations, hugging the shore far enough off to "give an offing," and taking no thought of anything else. They had passed Hatteras and the dangerous coast twenty-five miles north of it (see Crellin); Body Island light in view; no apparent danger now; master takes a nap and ship left in charge of two young men 21 and 22; helmsman not capable of making any calculations; steered so as to keep about same distance from land.

Meeting under 16th rule, each must port, even the vessel that is "closehauled on the wind," if necessary to save collision, and a fortiori, the vessel sailing free, as was the schooner. She did not port; bark did; bark is sued. The case presented by libellants is necessarily under 16th rule. But that is preposterous. Their lookout fixes the schooner to windward (eastward); therefore she had crossed (if it was a case of crossing some time before the collision) line south-southeast, on which it is admitted bark was moving. The bark's red light alone was seen. That disposes of this case. They were meeting. Schooner ran into bark, striking her port bow with bowsprit, making a round indentation. Only round timber could make a round hole; cathead and other timbers are square. In no other way could schooner's bowsprit

have been broken off near stem, i. e., by the concussion; for the schooner, after the first striking, slewed around to bark's starboard side; therefore the damage (round hole) to bark's port bow occurred at the first. The vessels rebounded, i. e., after bark's port bow was struck. The bark struck schooner's port bow with her stem, cutting deep, from a point two feet from stem, and ripping the hole wider to forerigging when slewing around. This accounts for Crellin's finding her cut as she was. The collision awakened the captain. Then, after the slewing he ran up and saw green light, by peeping under main boom at starboard side of bark, alongside his port side. Then master abandoned, without sufficient cause, a waterlogged schooner that could not sink, instead of going ashore in his boats, anchoring her in five fathoms water, and sending to Norfolk for B. and J. Baker's Resolute to tow her. The schooner's lights were burning dimly, unless red light was out. If burning dimly (and red therefore appeared white to our lookout), collision extinguished it and perhaps the green also. Neither was seen alongside, but only the red lantern was in view, because port side of schooner was alongside of the bark. See The Sam Weller [Case No. 12,290]; Peck v. Sanderson, 17 How. [58 U. S.] 178. Numerous witnesses, and the affirmative testimony of two lookouts, our mate then on watch, and seven witnesses who saw red lantern not burning, show our lookout could not have seen, before collision, the light.

The Grace Girdler, 7 Wall. [74 U. S.] 196, shows that, under the new rules, the "highest degree of care is not required, but only reasonable and proper precautions," in the very language of the rules. And this same case (7 Wall. [74 U. S.] 196) reverses all the older cases about dividing the loss for inscrutable fault. Even if that decision shall be erroneous on principle (and yet Blatchford, in the case of The Breeze [Case No. 1,829], says the weight of authority under old cases is in our favor), yet the Grace Girdler Case being under the new rules, as to reasonable care only being required, the law may now be considered as settled by the only decision (of the United States supreme court) under the new rules on that point. The fault is not inscrutable. The schooner is alone to blame, and most culpably; but unless preponderating testimony shows bark to blame, the supreme court says she must not contribute any part of the loss. Mr. Ellis cites old cases. New rules overrule them all; they are out of date; behind the age.

This case turns on its special circumstances. Schooner's captain asleep; helmsman displaying incompetency; the lookout clearing the bark under situation 3 of government diagrams of vessels actually passing to port, but for the schooner's changing her course at some time before her lookout first saw our red light; failure to port her wheel; failure to keep a bright red light; failure to keep a log; failure to take observations or make calculations; guessing that the wind was the same as at 8 p. m. (see all the logbook and protest); protest admitting red light seen by all on schooner before the collision, and yet the master afterwards falsely swearing in court it was the green light he saw. No efforts made to save the schooner; ignorant confidence in the freedom of a vessel on starboard tack "to keep her course and not port her helm," even if the wind was free to her; want of discipline, want of skill, want of attention. And no fault in our navigation (see testimony, logbook, and protest); all consistent from the beginning, because truth is consistent with itself, and our case is genuine; theirs spurious. A competent and vigilant lookout stationed at the forward part of the vessel, and in a position best adapted to descry vessels approaching at the earliest moment, is indispensable to exempt the steamboat from blame in case of accident in the nighttime while navigating waters in which it is accustomed to meet other watercraft. [St. John v. Paine] 10 How. [51 U. S.] 585.

As to steamers. Steamers navigating, etc., must have lookouts stationed in proper places on the vessel, etc. [Chamberlain v. Ward] 21 How. [62 U. S.] 571. Lookout stationed in positions where the view forward or on the side to which they are assigned is obstructed, either by lights, rigging, or spars of the vessel, do not constitute a compliance with the requirement of the law, and in general elevated portions, such as the hurricane deck (there is no hurricane deck except on a steamer), are not so favorable situations as those more usually selected on the forward deck, nearer the stem. (The forward deck on a steamer is a vastly larger deck than the forecastle deck on a vessel, which is very small.) The lookout was not properly stationed, being in a place where his view was obstructed. This is the principle. [New York & B. Transp. Co. v. Philadelphia & S. Steam. Nav. Co.] 22 How. [63 U. S.] 461. The watchman was standing aft of the pilot-house, which he admits was higher than his head, so that he could not see over it. His position for a lookout was clearly an improper one, as the view forward was entirely obstructed by the house of the vessel.

To constitute a compliance with the requirement of the law, there must be (in case of steamers) persons of proper experience properly stationed on the vessel, and actively and vigilantly employed in the performance of duty. [New York & B. Transp. Co. v. Philadelphia, etc. Co.] 22 How. [63 U. S.] 471. And see Act. Cong. April 29, 1864; 2 Brightly, Fed. Dig. art. 20, p. 429, § 32, requiring merely "a proper lookout" to be kept, without reference to topgallant, etc., deck, "such as is required by the ordinary practice of seamen, or by the special circumstances of the case." The special circumstances of this case were: 1st. That the bark was sailing by the wind,

and there was an unobstructed view, and the lookout saw as far as could be seen such a night an unlighted vessel. And it was the ordinary practice of Norwegian seamen to use the forward house as a station for lookouts when vessels are sailing by the wind, and also by many American masters. Ward v. The Ogdensburgh [Case No. 17,158]. "A competent and vigilant lookout stationed in the forward part of a vessel, with an unobstructed view, exempts." [The Genesee Chief v. Fitzhugh] 12 How. [53 U. S.] 443. Wheelhouse of a steamer not a proper lookout. 1st. He cannot steer and keep watch. 2d. Position is unfavorable; he cannot leave his wheel to give notice. But even then, want of such a lookout is only prima facie evidence. Case must still be governed by all its special circumstances, under new rules. Our vessel had two lookouts at the moment. Severe cases are steamer cases, and in England (2 Eng. Law & Eq. 557) the Europa was condemned for an injury to a sailing vessel in a thick fog, when there was an officer on the bridge, and a quartermaster on the topgallant forecastle, and another quartermaster at the ———, and one at the wheel. Now refer to steamer case [Chamberlain v. Ward] 24 How. [65 U. S.] 570, cited by the above. "In general, elevated positions, such as the hurricane deck, are not so favorable as those near the stem." The court assigns the reason. "Small vessels cannot be so easily seen from the upper deck of a steamer, especially if large; she might run over them before seeing them." Not so with sailing-vessels. Not so in this case (under its special circumstances), for the bark saw the schooner when near, not when far off, because she had no lights. The view to windward where she was clear, and he saw when near, not when far. As I understand the law and the rules, what is required, and no more, is that in the case under consideration the court must be satisfied that the lookout was stationed where he could see and have an unobstructed view of the vessel where she happened to be, not that he should be on any particular deck or spot.

HUGHES, District Judge. This is the rare case of a collision between sail-vessels far out in the ocean. The manner in which it happened can be known to but one or two of the very few persons who were present. To all others it is difficult of any theoretical explanation and incapable of any certain explanation. The evidence in this case, as in most other cases of maritime collision, reminds one of the incident which made Sir Walter Raleigh despair of the possibility of writing accurate history. Evidence, voluminous in the extreme, has been taken in this case, and a vast deal of expert testimony submitted from men of extraordinary skill and experience in maritime affairs, and the case has been argued at considerable length and with rare ability and ingenuity by the learned counsel engaged. If the schooner had not been lost and there were cross libels in the case, it would be necessary for me to go into this evidence and the arguments upon it as fully as counsel have done. But here there is but one libel, and the burden of proving fault is, until proven, wholly upon those representing the Fuller.

I have considered with care all that has been testified to in evidence and all that has been urged in argument, but only to become more and more persuaded of the narrowness and simplicity of the question upon which the case, as presented by the pleadings and evidence, really turns. The libellants charge, and have upon them the burden of positively proving, that the collision happened through fault on the part of the Kallisto. This was a Norwegian bark, manned, I think from the evidence, by such a crew as Norwegian vessels usually carry over the seas. It may be said, I think, with truth and without denial, that the crews of Norwegian vessels are in general remarkable for nautical skill, thorough discipline, individual proficiency and sobriety, and collective efficiency. The ships of this nationality are probably the best schools for merchant seamen now anywhere to be found. From the system of instruction and examinations pursued in Norway, I think the presumption as to the crews of Norwegian vessels is in favor of the general competency of master and crew. I think all mariners will agree that it is fair to presume, until the fact is disproved, that each man on board a regularly registered and manned Norwegian vessel is competent and attentive to the duties belonging to him. This general presumption I must say is thoroughly supported and justified by the evidence in this case as to the qualities and character of the Kallisto's crew.

The libellants in this case, therefore, set out with strong reasonable presumptions against them. The burden of establishing fault is upon them, and it is incumbent upon them to prove particular fault against a vessel and crew belonging to a nationality the vessels and crews of which are seldom in fault in nautical matters. In the present case, there is no proof of fault attempted in the matter of the Kallisto's side-lights, required by the laws of navigation to be kept in the rigging of vessels under sail. The libellants' own testimony establishes a compliance by the Kallisto in this respect with the legal requirements. As to lookouts it is not contended that there were not a sufficient number of men on the deck of the Kallisto on the occasion of this collision. There were three men on deck, besides the helmsman and the regular lookout. The only ground, therefore, on which libellants could found a charge of fault against the Kallisto, is in respect to the position on the bark in which her regular lookout was at the time of the collision. This is the only question on which it is possible

for the libellants to found a right to recover in this action. Their proposition is, or must necessarily be, that owing to the position occupied by the bark's lookout, before the collision, he was prevented from seeing the schooner as soon as he ought to have seen her, and from giving warning to the helmsman of the bark to port his helm in obedience to Rule XVI of the Navigation Laws, prescribed for sail vessels meeting end on, or nearly end on. Let me remark that I do not think this case is one of sail-vessels crossing each other, and I think, therefore, it does not fall within the purview of Rule XVII. This question of the position of the bark's lookout being the vital and in fact only one in this case, I have given especial attention and careful thought to it, and my conclusion, from a thorough examination, is that, at least on a vessel of the construction of a Norwegian bark, a lookout may justifiably stand on the top of the forward house, when the vessel is sailing full and by the wind, under a stiff breeze, the foresail standing out by force of the wind so as to make a curve upwards in the bottom edge; square sails being usually cut with a sweep or gore at the bottom. I think that it is satisfactorily shown that the top of the forward house was a place from which, during a stiff breeze, a lookout could readily see under the foresail what was ahead and over the bows of the ship, and that the lookout of the bark was not negligent of his duty on the occasion in question. The testimony of the whole crew of the Kallisto, and also of other witnesses, especially Captain Lennans, master of a German bark similar in construction to Norwegian barks, establishes this fact, and my own observation of Norwegian barks under sail by the wind confirms the testimony given on this head. I am satisfied, from the evidence and from observation, that while the Kallisto was under sail, and especially when the lower edge of the foresail is lifted up in a curve by a breeze, there is ample room for vision from the top of the forward house in every direction forward, and that a lookout could perform his duty properly from that position, whether sitting or standing. The very authoritative evidence of Captain Crellin conflicts, I know, with this conclusion; but he avowedly took no measures, but spoke from guess; so did Captain Stoddard. But Captain Brown actually measured, and gives dimensions as follows:

| | |
|---|---|
| Cathead, at least................ | 6 feet high |
| Foretack, above cathead.......... | 3 " |
| Sweep of the sail................ | 3 " |
| Lift of foresail in centre.......... | 3 " |
| Total ...................... | 15 feet |
| Height of top of forward house.... | 8 " |
| Clear ..................... | 7 feet |

From which some allowance must be made for the sheer of the vessel. I know of no rule of navigation or of law fixing any particular place forward at which a lookout shall at all times stand on a vessel in motion. If not sta-

tioned by the commander of his watch, he must judge of this for himself. He must of course be well forward. In time of apprehension he should be forward on the forecastle deck. That is in general the most proper place; it is often the only proper place. But, when sailing in the open sea, where there are few other vessels, in good sailing weather, on a night-watch on a square-rigged vessel, full and by the wind, with no special danger threatening, especially on a bark where the vision around is clear from the top of the forward house, I should say, from all the evidence in this case, that he might prudently sit or stand on the forward house of a square-rigged vessel, and could there perform his duty faithfully. I do not feel that I would be justified in this case in condemning the lookout's choice of that position on that occasion so as thereby to subject the Kallisto to the damages arising from the loss of the schooner.

The burden of proof is upon the libellants, and I am clear that, as against this lookout, they have done no more, even if they have done that much, than raise some "doubt" whether the collision was not owing to the fault of the lookout on the Kallisto, in being on the top of the forward house just before and at the time of the collision. It is certainly open to inference, from the evidence, that his failure to see the schooner was in consequence of her not then having had sidelights up and burning with proper brightness. It would not be a very violent inference, from the evidence, that Wesley Davis, an inexperienced seaman, who was at the schooner's helm at the time, starboarded instead of porting his helm when the schooner's lookout saw the red light of the bark and sang out, "Sail on the lee bow!" It is not only open to inference, but pretty clearly proved, from the evidence of libellants, that the two vessels were clear of danger of collision, under proper handling, four minutes before the event, that is to say, when nearly a mile apart, when the bark showed her red light. Certainly is there ground to infer, from the evidence, that the vessels came together by reason of false steering in some way, and, if there is doubt where that false steering was, the doubt is certainly as much to the prejudice of the inexperienced helmsman on the schooner as to that of the able seaman on the bark. No evidence is given by the libellants, nor do they contend that any false management of the bark's helm took place. The rule applicable, therefore, to this case, and which governs it, is the one laid down by the supreme court of the United States, in The Grace Girdler, 7 Wall. [74 U. S.] 196; that "when there is reasonable doubt as to which party is to blame, the loss must be sustained by the party on whom it has fallen."

It is not necessary for me to make any commentary on the nautical skill and ability, or the competency, or the special or general conduct of the master or crew of the Fuller; except to say that, if there is doubt on these

matters created by the general tenor of the evidence in the case, I think that doubt goes to the prejudice of the master and crew of the Fuller, and in favor of the master and crew of the Kallisto. I will not say that it is proved that the schooner and her master and crew were in fault, for it is not necessary for me so to do, but I will go so far as to say that the doubts produced by the evidence upon my mind are in .favor of the Kallisto and her crew, and that they are in prejudice of the Fuller and her crew. I have only to decide whether the libellants have proved, beyond "a reasonable doubt," that the collision was produced by the fault of the Kallisto. I do decide that they have failed to establish such fault beyond "a reasonable doubt." I will go even farther, though it is unnecessary to do so in this case, and repeat that, to my mind, the evidence more strongly tends to establish that the Fuller was in fault than that the bark was in fault. But as this is not a libel by the owner of the bark against the Fuller, and as it is unnecessary to carry this investigation or decision to that extent, I will confine my decision to the declaration that the libellants' charge of fault in the Kallisto is not proven; and I will sign a decree dismissing the libel with costs, giving thirty days for an appeal.

The following cases bear upon the questions arising in this case: Peck v. Sanderson, 17 How. [58 U. S.] 178; The Farragut, 10 Wall. [77 U. S.] 334; Cohen v. The Wilder [Case No. 2,965]; The Milwaukee [Id. 9,626]; The S. B. Wheeler, 20 Wall. [87 U. S.] 385; The Great Republic, 23 Wall. [90 U. S.] 34; The Pennsylvania, 19 Wall. [86 U. S.] 136; The Mabey and Cooper, 14 Wall. [81 U. S.] 205; The Grey Eagle, 9 Wall. [76 U. S.] 505; The Maria Martin, 12 Wall. [79 U. S.] 31; The Mary Eveline, 16 Wall. [83 U. S.] 348; The Sam Weller [Case No. 12.290]; The Breeze [Id 1,829]; The Empire State (lights in the centre) [Id. 4,474]; The Continental [Id. 3,-149]; and 49 N. Y. 379.