## THE WORTHINGTON AND DAVIS.

*(District Court, E. D. Michigan. April 30, 1883.)*

1. COLLISION—RUNNING INTO VESSEL AT ANCHOR—PRESUMPTION OF FAULT.

    The presumtion of fault arising from running into a vessel at anchor may be rebutted by showing that the moving vessel exercised all reasonable care upon her part, and that the collision was an inevitable accident; or by showing that the fault is with the anchored vessel in failing to use proper precautions.

2. SAME—ANCHORAGE IN ST. CLAIR RIVER—DUTY OF VESSEL.

    Anchorage in St. Clair river is not necessarily improper because the channel is comparatively narrow, and vessels are frequently passing and repassing, if room be left for vessels and tows to pass in safety. A vessel so anchored, however, is bound to keep a watch, and not to allow her sails to obstruct or obscure the view of her anchor light.

3. SAME—INSCRUTABLE FAULT—LIBEL DISMISSED.

    In cases of inscrutable fault the libel should be dismissed.

In Admiralty.

This was a libel for a collision between the schooner Gladstone and the schooner Davis, in tow of the propeller Worthington, which occurred on the night of July 26, 1881, on the St. Clair river, near Herson's island. The Gladstone was bound on a voyage from Detroit to the port of Golden Valley, Ontario. She left Detroit in the afternoon, under sail, reached the St. Clair river, and sailed up to a point a little above the place of collision. The wind, which had been light from the west or north-west during the afternoon and evening, about 9 o'clock failed altogether. The schooner, being unable to proceed further, came to anchor in the channel of the St. Clair river, somewhat upon the Canadian side. After coming to anchor, her riding lights were taken in, and a bright anchor light placed in her port fore-rigging, about 20 feet from the deck. For all that appears, this light was burning brightly up to the time of the collision. A lookout was also stationed upon the deck to watch approaching vessels. The night was clear, and lights could easily be seen at the usual distance. Some time after 10 o'clock the schooner Davis, which was the last of three vessels in tow of the propeller Worthington, bound down the river, came into collision with the Gladstone, breaking her jib-boom, bowsprit, and cat-head, and damaging her port bow.

*Moore & Canfield,* for libelant.

*H. D. Goulder,* for claimant.

BROWN, J. It is charged in the libel that the propeller was in fault in running too close to the Gladstone, and that the schooner Davis was in fault in not keeping a sharp lookout, and in not porting her wheel sufficiently to keep in the wake of the propeller, and thus avoid coming in contact with the Gladstone. Separate answers were filed on the part of the propeller and the Davis, the same counsel representing both vessels. Upon the hearing, however, there was no evidence showing the Davis to be in fault, as she appeared to have done the best she could in following the Worthington. The case against

her was practically abandoned. The answer on the part of the propeller avers that the wind was blowing a stiff breeze from the westward; that the Gladstone had her foresail and mainsail set, and was lying athwart the channel; denies that the schooner had a proper anchor watch; and avers that if she had any light it was so placed as to be obscured by the sails from the view of the vessels coming down the river. It was claimed, furthermore, that before discovering the Gladstone another propeller, the Oneida, had just passed the Worthington, and was ahead upon the same course and in the channel; and that the officers in charge of the Worthington, before discovering any light upon the Gladstone, saw the Oneida suddenly sheer to the westward, whereupon the Worthington put her wheel hard a-port, and changed her course as much to starboard as it safely could be; and that it was only when they had approached within about 200 or 300 feet that her officers and crew for the first time saw the light of the Gladstone. It was also averred that when the Worthington ported she gave the proper signal to the tow, and that the first vessel passed clear, the second within a few feet of the Gladstone's jib-boom, and the third vessel, the Davis, struck and did some injury to the Gladstone.

There can be no doubt of the proposition that, as the collision occurred with an anchored vessel, the burden of proof is upon the Worthington to show herself guiltless of fault. She may do this by showing that she exercised all reasonable care upon her part, and that the collision was the result of an inevitable accident, or, as is done in this case, by showing that the fault is with the schooner in herself failing to observe the proper precautions. The first fault charged against the Gladstone is that she was lying in an improper, unusual, and unsafe place. In this connection I can do little more than repeat what was said by Judge LONGYEAR in the case of *The Masters and Raynor*, 1 Brown, Adm. 342, that anchorage in the St. Clair river is not necessarily improper because the channel is comparatively narrow, and vessels are frequently passing and repassing, if room be left for vessels and tows to pass in safety. It always has been the custom for sailing vessels, navigating the Detroit and St. Clair rivers, to come to anchor in the channel, and I am not disposed to say such custom is unreasonable, though collisions are not infrequently occasioned thereby; and in the increasing magnitude of commerce we may be ultimately compelled to adopt a different rule; but I think it much more prudent for vessels to anchor as near the shore as the water will permit. Sometimes, however,—and that is claimed in this case,—the wind falls so suddenly that the vessel has no option but to drop her anchor where the wind leaves her. It would seem, however, that even in such a case something might be done, with the aid of the current and her rudders, to get the vessel closer into shore; but as there was undoubtedly sufficient room left for tows to pass the Gladstone upon the American side, I am not disposed to criticise her anchorage at this spot.

But, whether anchoring there from necessity or choice, I have no doubt that she is bound to exercise a greater degree of care and diligence in respect to her light and her anchor watch than would be requisite in case she were anchored out of the usual path of vessels. I am not disposed to say that she was in fault for having her sails up, if she had otherwise complied with the statute in having a light which could be readily seen by vessels coming up and down the river. The labor of getting a vessel under way would undoubtedly be much lessened by having her sails already hoisted, in case a favorable wind should spring up, and if the light be properly displayed I do not see that the liability to collision would be thereby enhanced. This was the opinion of Judge WILKINS in the case of *The Planet*, 1 Brown, Adm. 124. In this case I cannot see that the furling of the sails would have assisted the schooner any in enabling her to give way to the descending tow.

The difficulty in the case turns upon the question whether the Gladstone displayed a proper anchor light to approaching vessels. There seems to be no question that she did display a bright light about 20 feet from her deck, and it appears to have been set in her port fore-rigging, but it certainly did not comply with rule 10, Rev. St. § 4233, which requires that all vessels, when at anchor in roadsteads or fair-ways, shall exhibit, where it can best be seen, a white light, so constructed as to show a clear, uniform, and unbroken light, visible all around the horizon. Now, this light, while complying with the law in other respects, clearly was not visible to a person approaching from the starboard side of the vessel back of the foremast, and in that respect there can be no question that the schooner was in fault, and the only remaining inquiry is whether such fault contributed to this collision. Upon the part of the schooner it is averred that the wind was north-west, and that she was heading a little toward the Canada shore, and hence that her light could be clearly visible to all vessels coming down the stream. Upon the other hand there is a large amount of testimony tending to show that there was a brisk wind from the south-west, and that the vessel was lying with her head canting towards the American shore, in a position which *might* at least have obscured her light to a propeller coming down the stream. This testimony is corroborated by that of the witness Kirby, who swears that the injury was done by the wrenching of her jib-boom and her bowsprit from starboard to port. If her hull was struck at all it would appear to have been a mere glancing blow, and that the principal injury was done by the jib-boom catching the mast of the Davis and breaking it off. This, with the wrenching of the bowsprit, inflicted the only serious damage to the schooner. It seems, too, that the Oneida, which preceded the Worthington down the river a very short distance, did not observe her light until she was very near to her, and that her attention was first called to her, not by seeing the light directly, but by seeing the loom of the light upon her sails. The men upon the Worthington also swore that they did not see her light, and ported only be-

cause the Oneida ported, and that the light was first revealed when they had approached very near to the schooner. Had the Worthington seen this light at a greater distance, it would undoubtedly have been her duty to port sooner; but if we are to believe the testimony of her officers and crew, and those of her tow, the Gladstone's light must have been concealed either by the Oneida (in which case the accident as to the propeller would have been inevitable) or by the sails of the Gladstone. In my opinion the propeller has rebutted the presumption of fault which attached to her colliding with a vessel at anchor, and put it upon the Gladstone, although the case is an exceedingly close one.

If the case be not one of fault on the part of the Gladstone, it is, to my mind at least, a case of inscrutable fault, and the question remains to be considered what is the measure of liability in respect to collisions of this character. Cases of inscrutable fault are those wherein the court can see that a fault has been committed, but is unable, from the conflict of testimony, or otherwise, to locate it. Since the introduction of colored lights and fog signals these cases are of rare occurrence, and the measure of liability is still an unsettled question. At common law the plaintiff is bound to make out his case by a preponderance of testimony, and if the question of fault is left in doubt the defendant is entitled to a verdict, and the loss rests where it falls. This is also the rule in the English admiralty and vice-admiralty courts. *The Catherine of Dover,* 2 Hagg. 154; *The Maid of Auckland,* 6 Notes Cas. 240; *The Rockaway,* 2 Stew. Vice Adm. 129; *The City of London,* Swab. 300, 302. The laws of Oleron, of Wisbuy, and the Marine Ordinance of Louis XVI., made no distinction between cases of mutual fault, inscrutable fault, and inevitable accident, but divided the damages in every case where the collision was not the fault of one party only. This rule was probably adopted on account of the difficulty of determining to which vessel the fault was imputable. It has received the sanction of Emerigon, Valin, Pothier, Grotius, and most, if not all, of the continental authors upon the subject. It has been incorporated into the French Commercial Code, but in the German Code no allusion whatever is made to this class of cases. The question has never been definitely settled by the supreme court of the United States, although in the opinion of Mr. Justice SWAYNE, in the case of *The Grace Girdler,* 7 Wall. 196, there is a *dictum* to the effect that "where there is a reasonable doubt as to which party is to blame, the loss must be sustained by the party on whom it has fallen;" citing *The Catherine of Dover,* 2 Hagg. 154. The point does not seem to have been argued by counsel, and the case was disposed of as one of inevitable accident. The district courts are about equally divided in opinion *The Scioto,* Davies, 359; *The John Henry,* 3 Ware, 264; *The David Dows.* 16 Fed. Rep. 154. *Contra, The Kallisto,* 2 Hughes, 128; *The Breeze,* 6 Ben. 14; *The Summit,* 2 Curt. 150; *The Cherokee,* 15 Fed. Rep.

119; *The Amanda Powell*, 14 FED. REP. 486. Although I know of one reported case in which the rule was actually applied, (*Lucas* v. *The Thomas Swan*, Newb. 158,) it has apparently met with the approval of Mr. Justice STORY in his work upon Bailments, (sections 608, 609,) Chancellor KENT, (3 Kent, Comm. 231,) Judge CONKLING, (1 Conk. Adm. 378,) and most of the American elementary writers, though none of them pronounce a decided opinion of their own. Fland. Mar. Law. §§ 357, 358; Bouv. Law Dict. tit. "Collision." The question received, however, its most elaborate discussion by Judge HALL, of the Northern district of New York, in the case of *The Comet*, 9 Blatchf. 323 and the continental rule was adopted without hesitation.

These authorities are undoubtedly entitled to great respect, but it will be observed that in most of them there is no discussion of the question as an original proposition, and the rule is apparently adopted in deference to the continental doctrine. Conceding that the maritime law of continental Europe favors a division of damages, does it necessarily follow that the law as administered in this country should be the same? I think not. While the maritime Codes of the different countries have undoubtedly many features in common, there are probably no two exactly alike. A reference to the provisions upon the subject of collision will show that the German law differs in many particulars, notably in regard to the division of damages, from the French, and that again from the Dutch and Russian. Indeed, the ancient Codes and writers, cited by the learned judge in the case of *The Comet*, declared that in cases of inevitable accident the damages shall be divided; yet nothing is better settled in the maritime law of England and America, than that in such case the loss shall rest where it falls. Uniformity, at least, does not require us to adopt the rule of division in cases of inscrutable fault. In short, the maritime law is not international, except in a limited sense. It inevitably takes on a local coloring conformable to the habits and traditions of the different countries in which it is administered.

There are certain fundamental principles of justice adopted by the English and American courts which have become maxims of jurisprudence, and are equally binding in cases of common law, equity, and admiralty jurisdiction. Among these is that which prohibits a person being deprived of his liberty or property without being proved guilty of some fault or dereliction. Under the terms "due process of law" or "law of the land" provisions of similar import are inserted in all our constitutions. "By the law of the land," said Mr. Webster, in the *Dartmouth College Case*, 4 Wheat. 518, "is most clearly intended the general law which hears before it condemns, which proceeds upon inquiry, and renders judgment only after trial. The meaning is that every citizen shall hold his life, liberty, property, and immunities under the protection of general rules which govern society." Every person is presumed innocent, even of fault, and is entitled to rest

upon that presumption until shown to be guilty; and the whole object of our judicial machinery is to determine by competent proofs who has committed a crime, perpetrated a wrong, or broken a contract. If charged with a crime, the accused must be proven guilty beyond a reasonable doubt. If damages are sought, the plaintiff, the *actor*, must always make out his case by at least a preponderance of evidence. If the evidence is clearly balanced, it is the duty of the court to dismiss the proceedings. I know of no reason why this same rule should not obtain in collision cases. The difficulty of proof is usually not greater; the injustice of a false step is no less. Indeed, they are peculiarly cases wherein fault should be established and located, since the loss, in a large majority of cases, falls upon persons guiltless of all personal blame. So strongly has this consideration appealed to the good sense of the mercantile world, that, by the laws of most civilized countries, the liability of an innocent owner is limited to the value of his interest in the offending ship and her freight. The doctrine of division in cases of mutual fault, though an infringement upon the common law, is not an exception, and hardly a qualification, of the rule requiring the libelant to establish his case. It is only a simplification of the doctrine of contributory negligence,—a measure of damages rather than a method of proof, and the only practicable mode of doing justice in cases of mutual fault. For these reasons my own opinion is decidedly in favor of the English rule adopted by Mr. Justice SWAYNE in *The Grace Girdler*.

The libel will be dismissed, but, as the case is one of very grave doubt, no costs will be awarded to either party.