## THE RAMLEH.

(District Court, D. Massachusetts. October 31, 1907.)

### No. 1,423.

COLLISION—SUIT FOR COLLISION—PROOF OF INDEMNITY OF VESSEL.
Evidence considered in a suit against a British steamer for collision with a bark on a foggy night, some 60 miles southeast of Cape Henry, and *held* insufficient to sustain the burden of proof resting on libelant to prove the identity of the vessel in view of the testimony of the witnesses from the steamer, consisting of more than half of the officers and crew, all of whom positively denied that she was in any collision, although she was admitted to have been within a few miles of the place of collision at the time, no one on the bark having been able to make any positive identification of the steamer on the night of the collision.

[Ed. Note.—For cases in point, see Cent. Dig. vol. 10, Collision, §§ 266–279.]

In Admiralty. Suit for collision.

Blodgett, Jones & Burnham, for libelants.
Convers & Kirlin, for claimant.

DODGE, District Judge. The libelants' bark Rebecca Crowell, of New York, while on a voyage from Rosario to Philadelphia with a cargo of bones, was in collision with a steamer at about half past 8 in the evening of Sunday, November 16, 1902, and thereby sustained serious damage. The collision happened, according to the libel, at a point between 50 and 60 miles S. E. by E. from Cape Henry. It happened in foggy weather, and the name of the steamer, which passed out of sight of the bark immediately after the collision, was not ascertained at the time by any one on board the bark. This libel alleges that the Ramleh was the steamer. It was filed against her on February 6, 1903.

The answer denies that the Ramleh was the steamer which collided with the bark, and denies, also, all allegations in the libel which charge the Ramleh with responsibility for the collision. It is conceded, however, that, if the Ramleh was in fact the steamer wherewith the bark collided, she was to blame and is liable for the damages. The only question to be decided is therefore the question of identification. Have the libelants sustained or not the burden of proving that the steamer with which the bark collided was the Ramleh and no other? That

the bark did, in fact, collide with a steamer at about the time alleged does not seem to be disputed, or to admit of doubt.

The libelants rely (1) upon evidence from eyewitnesses of the collision, describing, as they saw her at the time, the steamer concerned in it, and otherwise tending to identify that steamer with the Ramleh; (2) upon evidence tending to show that the Ramleh's course and speed toward Savannah must have brought her to or near the alleged place of collision at the time it happened; (3) upon evidence claimed to show that no other steamer like the Ramleh was at or near the place of collision at the same time; (4) upon alleged admissions by the Ramleh's master.

1. The eyewitnesses of the collision on board the bark who have testified are two in number out of five men in all who were on her deck at the time. The captain's watch had been the watch on deck since 8 o'clock. It consisted, besides the captain himself, of the second mate and three other men. One of the men was on lookout, and was sounding the fog horn, one was at the wheel and one amidships. There is no evidence from the second mate nor from any of the men in the watch. The vessel, after the collision, was brought into Norfolk, and taken thence to Philadelphia for repair, where the second mate, lookout, and man at the wheel appear to have left her. Not even their names appear in the evidence. The master has testified that they were foreigners, unable to speak and hardly able to understand English. When they left the bark, it is true, no suit had yet been begun, nor, so far as the evidence shows, had any grounds for charging the Ramleh been ascertained. The absence of evidence from them, however, has left what was seen of the colliding steamer on board the bark to be gathered from the testimony of the master and first mate only, neither of whom was on deck when the steamer's approach was first announced by the sound of her whistle. Both were below at that time, heard her whistle while there, and reached the deck afterward.

Blaustin, the mate, gave his deposition in Philadelphia February 26, 1906, more than three years after the collision, and after all the evidence in defense had been taken. He says he had gone to bed after coming off watch at 8 o'clock, but upon twice hearing a steamer's whistle went on deck again, and found the steamer quite close to the bark. He saw the steamer's starboard side as she passed the bark's bow. The bark's course was then about N. E. and the steamer was heading southerly. The bark's jib boom appeared to him to go over the steamer's rail, and then to be swung around by contact with her rigging; the bark's bowsprit next striking the steamer's starboard quarter a few feet below the rail. The steamer was swinging to port under a starboard helm. What he noticed before the steamer got out of sight was that she had something light on her smokestack, and two small houses not far apart; that she was black in color; that she had two masts slanting aft, and topmasts jointed or "fitted" on the masts; also that she was light, and not loaded. He says nothing about any name or lettering on the steamer's stern. About a month later he saw the Ramleh in Portland, Me. He saw there that she had a white and blue band on her smokestack, two small houses amidships, and masts and topmasts like those of the steamer he had seen November

16th. Very few steamers, according to him, have their topmasts so arranged. He saw also a dent on the Ramleh's starboard quarter, at the place where the bark's bowsprit had seemed to strike the colliding steamer, of about the size the bowsprit would make. When he saw her, the Ramleh had the appearance of the colliding steamer, and after he saw the dent referred to he was sure she was the same. His inspection of her at Portland was made in company with the bark's master, whose evidence is next considered.

George W. Dow, master of the bark, testified in person at the hearing in this court in March, 1906. He was one of two witnesses, both called by the libelants, who were the only witnesses in the case seen or heard in court. All the rest of the evidence on both sides was in the form of depositions taken, as will more fully appear, at different times before the hearing, some of them many months before. Capt. Dow's observation of the colliding steamer was, in substance, as follows: He was below in the cabin. He twice heard a steamer's whistle. He went on deck, and from the forward part of the poop saw the steamer's mast headlight emerge from the fog; saw next her foremast, noticing at the time the doublings of the topmast which it carried, and next saw the whole length of the steamer, noticing, also, that she was swinging to port under a starboard helm. Her bow passed the bark's jib boom. She went across the bark's bow until her main rigging carried the jib boom away, and the bowsprit then struck her starboard quarter some 30 feet from her taffrail and below her rail. Using his night marine glasses, he examined the steamer's stern as it cleared the bark's forecastle in order to read her name, if possible. He caught the left-hand letter of the name of her hailing port, and made it out to be "L." He looked above for the vessel's name, and caught the first left-hand letter of it, "R." He could distinguish no more, except the white letters running together. The vessel's name was a word shorter by about one letter than the name of the port above which it stood. The color of the hull he described as black—badly faded—gray. There was a white water-closet right up close forward on the bow. There were two small houses, also white, one forward and one aft of the smokestack. The smokestack had a light band. Near the stern was a small companionway of the color of teakwood. He estimated the size of the steamer at about 2,500 tons gross. She was light and very high out of water. She remained in sight only a few seconds after the collision, then became lost in the fog, and was not again seen. With the mate, he went to Portland on January 20, 1903, and there examined the Ramleh. He produced photographs of her then taken. In his belief she was the same steamer. He founded this belief upon her general appearance, the doublings of the topmasts, the water-closet forward, the companionway aft, and the smokestack—black, with a white band having a light bluish center. A dent which he saw on the Ramleh's starboard quarter must have been caused in his opinion by the bark's bowsprit, and a bend in the rail forward of it by the bark's jumpers and martingale.

So far as the evidence of witnesses who saw the collision is concerned, the libelants have the above testimony to rely on, and nothing more. This testimony, in the natural and proper order of proof, would

have been given soon after the libel was filed, and before any evidence had been taken on the steamer's behalf. Delayed as it has been until more than three years following the collision had expired, and until after the entire evidence in defense was known, it is less convincing and the more open to question than would have been the case if it had been the first, instead of the last, testimony given in the case, notwithstanding the fact that I have seen no reason whatever to regard Capt. Dow as other than an honest witness. The opportunity afforded him or the mate for observation at the time was at best very brief, and very far from being favorable. It was after dark on a foggy November evening. It is said that there was a moon, and this statement is borne out by the almanac; but it was invisible and obscured by fog. The rapidity with which the steamer was lost sight of forbids the belief that any material help in seeing was had from this source, or from the various lights carried by the respective vessels. Both witnesses had just reached the deck from below. They agree that the steamer they saw was black in color (whether faded, as the captain thinks, or not); that she was light, and not loaded; that she had a light band on her smokestack; and that she had two masts carrying topmasts jointed or "fitted" on them. To the other details mentioned by either witness I do not think much weight can be given. I cannot consider it safe to rely on what Capt. Dow claims to have read on her stern as any basis for identification. If he had been as certain at Portland regarding what his night glasses had enabled him to read, as he was when he testified three years later, I think he would hardly have omitted looking at her stern while there to see how those letters looked by daylight. It appears that he has not been to sea since July, 1903, on account of failing eyesight, and that he had nearly reached the age of 70 at that time. It would be difficult to credit him, therefore, with any unusual power of vision, under the unfavorable circumstances existing while he was looking at the steamer.

There is no dispute that the Ramleh was on a voyage to Savannah, in ballast, on November 16, 1902; that her color is black; that she has a lighter band on her smokestack; or that she had topmasts of the kind described by the above witnesses, and a water-closet forward. British "tramp" steamers of her size and type, however, are not uncommon, and they are to be found possessing all the features relied on. Pole masts appear to be the kind of masts usually carried by American coastwise steamers. But there is no evidence that topmasts like the Ramleh's are so rare as to make hers sufficient for identification in themselves.

The Ramleh's evidence is that her starboard side, which is the side which Capt. Dow must have seen, was painted before leaving New York on this voyage. That Capt. Dow should have described it as badly faded or gray is a circumstance which does not tend in favor of the correctness of his identification. The mate, it is true, did not so describe it.

The Ramleh arrived in Savannah at the end of her voyage on the afternoon of Tuesday, November 18, 1902, two days after the collision alleged in the libel. When she arrived, she had an impression or dent on one of the plates on her starboard quarter not far below her

rail. The libelants' witness who saw it at Savannah describes it as 3 or 4 feet long, and about 20 inches or more wide, in the second or third plate from the top. It is shown in the photograph, Claimant's Exhibit AA, and was the dent seen at Portland by the captain and mate of the bark two months later. That the steamer had such a dent upon her starboard quarter at Portland, and that it was also there at Savannah, is not disputed. The claimant's evidence, however, is that it was not received during the voyage from New York to Savannah, but had existed for a long time before that voyage. To the fact that it had been there for some years there is abundance of testimony, coming not only from the steamer's master and other members of her crew on board during the Savannah voyage, and from one of the managers of the company which owned her, but also from Morrison and Dusting, two masters who had previously had command of her, from the foreman of the dry dock at Birkenhead in which she had been accustomed to repair, and from Lloyds' surveyor at Liverpool. She docked for repair at Birkenhead in 1901, and again in 1902, at a time earlier than the Savannah voyage, and the two witnesses last mentioned state that on these occasions the question of removing the dent was considered, with the result that it was decided not to incur the expense of removing it because it did not affect the steamer's seaworthiness.

The libelants offer no direct contradiction of the evidence that this steamer's starboard quarter bore the same dent before the Savannah voyage in question. They argue that the owners would not have omitted to repair such an injury had it in fact been sustained so long before that voyage as is claimed, and they argue that such an injury could not have been originally inflicted in the manner described by Morrison, who commanded the steamer in 1896, at the time the dent was originally received, according to him. These arguments I must regard as insufficient to overcome the force of the evidence that the dent, however originally caused, existed before the collision; and I am therefore unable to attach any importance to it as a means of identifying the Ramleh as the steamer which the master and mate of the bark saw in collision with their vessel.

There is no evidence that the Ramleh's starboard side showed at Savannah any other marks such as would indicate a recent collision such as that with the bark is described to have been. As to a bend in an iron rail or a broken deadlight seen on board her at Portland in the vicinity of the alleged place where the colliding steamer was hit by the bark, I cannot regard them, under the circumstances which appear, as affording any substantial assistance to the libelants' claim.

2. Inquiring next as to the place where the steamer described by the eyewitnesses from the bark was encountered, the libelants' proof is that the bark, as she came up the coast from the southward, had had no observation for three days, that she had seen nothing from which her position could be exactly determined during that time, and that her positions from day to day had to be fixed by dead reckoning alone. The sea had been smooth and the wind very light during most of this time. The master testified:

"We came in across the Gulf Stream where the current is very uncertain; and you couldn't determine the position under those circumstances within 25 miles possibly."

The place of collision alleged in the libel was therefore known on board the bark by approximation only. No better means of knowing it existed when the libel was sworn to. The place stated in the libel accords with the estimated positions of the bark as set down in her log. Since 6 p. m., 2½ hours before the collision, when she tacked off shore, she had been heading from E. by N. to E. N. E., and had been making very little headway on those courses.

The Ramleh's master, claimant in these proceedings, has answered interrogatories annexed to the libel. The answers were filed June 5, 1903, with the answer to the libel. According to them, the steamer left New York for Savannah on Saturday, November 15, 1902, at 4:30 p. m., on Sunday, November 16th, at 8 p. m., Cape Henry was bearing N. 67° W. 78 miles distant, and on the same day at 9 p. m. N. 62° W. 81 miles distant. In other words, at 8:30 p. m. the steamer was pretty nearly in the same direction from Cape Henry as was the alleged place of collision, but she was some 20 miles further away from it. I can attach no importance to a statement made by Capt. Dow in his evidence at the hearing that the place of collision was about 65 miles from Cape Henry. There is no reason whatever for believing that he had any better means of fixing the place or estimating its distance from Cape Henry when he testified than he had when the libel was filed. What the libel alleges regarding the place of collision came or ought to have come from him as the person best able to know. He was bound to see that it was stated with as much accuracy as was possible by the use of all the means of knowledge then available. When he testified three years later, he had learned that the steamer claimed to have been 20 miles further off shore, and knew what the evidence was upon which she based her claim.

The libelants, however, are not now obliged to rest their contention that the Ramleh was at the place where the bark encountered a steamer answering more or less to her description at the time alleged upon their own evidence only. The claimant has introduced much evidence in support of his denial that the Ramleh was the steamer mentioned in article 3 of the libel, consisting, in part, of depositions by her master, mates, and engineers. Among these witnesses are the officers in charge of her navigation from 8 o'clock until midnight on the day in question, and they have all been fully examined and cross-examined in regard to the steamer's position at 8:30 p. m., also in regard to her navigation before and afterward, so far as it bears in any way upon her position at that hour. During the examination of these witnesses there have been produced her chief officer's log, scrap log, chief engineer's log, and engine-room log; also a chart (Libelants' Exhibit 2), which was in use on board the steamer during her voyage, and upon which her master, in giving his testimony, has marked her position at noon on November 16th and at 6, 7, 8, 9, and 10 p. m. on the same day. At 8:30 p. m. the steamer had been only 25 hours from Sandy Hook, and only about 20⅓ hours from a position 12 miles off

Barnegat Light, which she passed at 12:07 in the morning of November 16th. Her courses since passing Barnegat and her speed on each course having been noted and recorded hour by hour, it should be possible to fix her position each hour and at 8:30 p. m. with much less liability to error than is possible in the case of the bark, although Barnegat was the last point on shore which had been seen, and although since she passed it the steamer had been most of the time in foggy weather. It appears that at 5:10 a. m. on the next day—Monday, November 17th—the steamer passed Diamond Shoal light ship, that she passed it at a distance of about half a mile, and that it was the next landmark seen after Barnegat. Her course from Barnegat until noon on Sunday, November 16th, and her position at that time, have been marked on Claimant's Exhibit 2. If from noon on Sunday she ran upon courses which would bring her at 6, 7, 8, 9, and 10 o'clock in the evening of that day to the positions marked on the same chart, it would seem that she must have been running upon courses differing either from those set down in the chief officer's log produced, or else from those set down in the scrap log produced. Between 2 p. m. and midnight the courses appearing by these books differ, and those shown in one would carry her more in shore than those shown in the other. And if at 5 o'clock on the following morning she was close to Diamond Shoal light ship it seems to follow that between 10 p. m. on November 16th and 5 a. m. on November 17th, she must have followed courses differing from those set down in either log book, and inclining considerably more to the westward than those there set down. The master of the steamer testifies that he did, in fact, keep her further out to sea than the most direct course for Hatteras would have taken him, and that he did so on account of fog, and that he afterward headed her inshore again; but the difficulty of harmonizing these statements with what is found in the log books constitutes to my mind the principal argument in favor of the conclusion that the steamer must between 8 and 9 p. m. have been much further to the westward than her officers claim her to have been. Other discrepancies between the log books and the testimony which have been pointed out do not seem to me significant enough to require special mention.

3. Millard G. Dow, son of the master of the bark, her managing owner, and the only other witness who gave evidence in person at the trial, testified that after obtaining lists of the steamers which left New York, Philadelphia, and Baltimore on November 15 or 16, 1902, according to the records of the maritime exchanges at these ports, he found only three other steamers mentioned besides the Ramleh whose voyages would or might have brought them near the alleged place of collision at or about the alleged time; and that no one of the three corresponded in appearance with the steamer seen and described by Capt. Dow and his mate. It was the result of this investigation, together with information received from Savannah that the Ramleh's starboard quarter showed the dent above referred to upon her arrival there, which caused him to have notice of the bark's claim sent to the Ramleh's owners in England, and was the occasion of Capt. Dow's visit to Portland with his mate to inspect the Ramleh herself.

The lists from the three maritime exchanges procured **as above**

were offered in evidence against objection on the Ramleh's behalf; it being conceded, however, that they sufficiently showed what appeared by the records of the exchanges as they stood. Mr. Dow testified, also subject to objection, as to each steamer named in the lists, whether or not in his judgment she would have been in the locality of the collision at the time in question, and how far she corresponded in appearance with the steamer seen from the bark.

It is clear that the rules of evidence do not permit the introduction of the lists or of such testimony; but, even if it were otherwise, no conclusions could be drawn from them which would much assist the identification which is sought to be accomplished. Not only would it be impossible to be sure that either list is complete, but there are other ports from which no list has been obtained, wherefrom other steamers might have sailed on voyages such as would bring them into the locality of the collision at the time it happened. There is evidence from the master and second officer of the Ramleh that about an hour before the collision, during a clearing interval in the fog, the light of a steamer going the same way had been seen about two miles distant on their starboard side. There is not, nor could there be, any description or identification of this steamer; but I find no reason in the record for refusing to believe that any such steamer's light was seen. And, without regard to this piece of evidence, these are not unfrequented waters, remote from any main highway of commerce, so that it could not be said, even upon Mr. Dow's lists and testimony, that the possibility that another steamer of the Ramleh's general appearance may have been in that vicinity has been excluded.

4. Before the master of the bark went to Portland in January, 1903, there had been correspondence between her owners and the owners of the Ramleh, in which the claim had been made that the two vessels had collided at or near the place alleged in the libel. There was at Portland an interview between the master of the bark and the master of the Ramleh, during which the latter said, "You struck our position pretty nearly." The chart, Claimant's Exhibit 2, was then produced, and, according to the master of the bark, the master of the Ramleh indicated his position at the hour of collision upon it at about the place claimed by the bark. The master of the Ramleh, however, testifies that the position he then indicated was in substance the position now appearing as marked by him on the chart. He testifies, also, that he told the master of the bark at another conversation in Portland soon after that, if he "was found guilty of this thing," it meant or might mean the loss of his certificate, but he denies having said that he "hoped the master of the bark would not be hard on him" for that reason, as the latter declares him to have said. In the evidence regarding these conversations, I find no clear proof of any admission by the master of the Ramleh, either express or implied, that his vessel had collided with the bark or with any other vessel, or that his position at the time in question was other than that to which he has testified. I cannot conclude from expressions like those testified to, detached as they are from the connection in which they were used, and from the spirit or general drift of the conversation in which they occurred,

that the master meant to admit what he appears to have constantly denied both before and after the conversations referred to.

Assuming, however, what I think must be admitted, that a case of strong probability, in the absence of sufficient contradiction, is made out against the Ramleh, I next consider the evidence by which it has been met.

In support of his denial that the Ramleh collided with the bark on the evening in question, the claimant relies upon the testimony of 12 persons, out of 23 in all, who were on board her during her run from New York to Savannah. The members of her crew, who have not testified in the case, are 11 in number and 6 of them appear to have been Greeks, employed as firemen. As to the 5 remaining, they are two seamen who belonged to the chief officer's watch, 2 who belonged to the other watch, and the boatswain, Rogerson. All these 11 men appear to have left the ship at Liverpool on her return thither from Savannah about the middle of December, 1902, and to have been thereafter lost sight of. The first notice from the bark's owners, of the claim that the Ramleh had collided with their vessel appears not to have reached the Ramleh's owners until several days had passed after her voyage had thus ended, and her crew had been paid off.

From 8 o'clock until 12 on the night of the collision there were on watch on board the Ramleh Stewart, her chief officer, and three seamen, viz., Shiel on lookout, Langford at the wheel between 8 and 10 o'clock, and Reynolds. Stewart gave his deposition at Savannah in February, 1903. Shiel's was taken on commission in December, 1905. Neither Langford nor Reynolds has testified.

Stewart, the chief officer, declares that during this watch the Ramleh struck no other vessel, heard no other vessel's horn, and ran all the time at full speed, without any signal being rung to the engine room, and without making any change in her course. Asked on cross-examination if another vessel did not strike the steamer at some time during the voyage, his answer was: "Not a single vessel, as God is my judge." He further testified on cross-examination that nothing struck the steamer aft either before or after he went on watch at 8 o'clock, and that while he was on deck she did not come within sight of any other vessel.

Shiel's testimony is that he did not hear of or see any other vessel during the watch; that he neither saw nor heard of any collision during the voyage; that the steamer was not in collision at any time during the voyage to the best of his knowledge, and that if any collision had occurred he would have seen it or else heard of it. He denies that the steamer came near any sailing vessel during the watch, and denies, also, that any stoppage of her engines occurred during those hours.

The second officer, Chapman, with Watterson, Jensen, and Wallace, seamen, were on duty from 6 until 8 o'clock the same evening. Chapman and Watterson gave their depositions at Savannah in February, 1903. Chapman, who says that after going off watch at 8 he staid awake until about 9 o'clock, testifies that nothing collided with the steamer during his watch or before 9. No engine room signals were

given, nor were the engines stopped or reversed, according to him. Watterson's evidence is that after the watch was over he staid awake till about half past 8. Nothing struck the steamer that evening, nor did she strike any other vessel; of that he is positive.

The chief engineer, Anderson, second engineer, Pinnington, third engineer, Hayward, and Accousis, a donkeyman, from the engine department of the steamer, have also given their depositions—Pinnington, Hayward, and Accousis at Savannah in February, 1903; Anderson at Mobile in November, 1905. Anderson and Accousis were on duty in the engine room between 8 and 12 o'clock. Both deny that the engines were stopped during their watch, and deny that they knew of or heard of any collision. Pinnington and Hayward, though not on duty, were during the hours referred to in their quarters, close to the engine room. Both deny any knowledge of any collision, and both say that any signal to the engine room, if given, would have roused their attention, and brought them into the engine room itself, to see if they were needed. Anderson says that no other vessel could have touched the steamer without the impact being perceived throughout the ship.

Richmond, the steward, and Johnson, messroom steward, gave their depositions at Savannah in February, 1903. Hinchcliffe's (the cook) was taken on commission in December, 1905. Richmond's evidence is that he was in his room off the cabin on the starboard side aft, turned in, after 8 o'clock. Johnson says that between 7 and 11 o'clock he was in his room on the starboard side amidships, and awake. Hinchcliffe was at work in the galley from 8 to 9 o'clock, and in his room adjoining from 9 to 10 o'clock. These three witnesses all deny that there was any collision or any stopping of the engines during the evening, and say that they must have been aware of anything of the kind had it happened.

As to the claimant himself, in command of the steamer at the time, he states in his deposition given at Savannah in February, 1903, that he was on the bridge, or in the chartroom directly underneath it, all night. He denies that any sailing vessel was seen, any order signaled to the engine room, or any change made in the steamer's course from half past 7 until 9. He denies that the steamer struck anything during the voyage.

Unless all this testimony from the officers and crew of the Ramleh is willfully and deliberately false, she was not in collision at all during the evening in question, and cannot have been the steamer which collided with the bark. It is part of the testimony of the bark's master and mate that the steamer which they saw was turning as if to avoid the bark under a starboard helm; that a bell like an engine room signal was heard from on board her; that her engines and propeller were stopped; also, that a hail was heard from some person on board her as the vessels were clearing each other. If these things were true of the Ramleh at 8:30 p. m. or at any other time on the evening of November 16, 1902, there is no way of escaping the conclusion that all the above witnesses have sworn falsely. Their denials are in terms which exclude the possibility of mistake, and have

met the issues raised without evasion. As to the claimant himself and the chief officer, it may, of course, be said that they have a strong personal interest to conceal the occurrence of a collision if there was one. As to all the other witnesses who testified at Savannah in February, 1903, viz., the second officer, the seaman, Watterson, the second and third engineers, the donkeyman, Accousis, and the two stewards, they had not left the ship on her return to Liverpool in the preceding December, but were still on board her, in the employment of her owners, under the same officers; and it may be said that they were under an inducement to exonerate the Ramleh without regard to the truth or falsity of their testimony. The same may be said as to the chief engineer, Anderson, who was employed on board the Rose Lea belonging to the same owners, and under the same master, when he testified two years later at Mobile. The same cannot be said, however, of Shiel or of Hinchcliffe, neither of whom appears to have been in any way connected with the Ramleh or her owners or officers at the time he testified.

As to the fact that there has been no testimony from Langford or Reynolds of the watch on deck, from Jensen or Wallace of the watch below, or from the boatswain Rogerson, the record discloses no reason for questioning the truth of the answer to the seventh interrogatory annexed to the libel—that these men were among those paid off at Liverpool December 15, 1902, and that their whereabouts was unknown when the answers were sworn to in February, 1903. Three of the men so paid off and mentioned in the same answer were afterward found and examined, as has been above stated. Interrogatories to examine Langford, Reynolds, Jensen, and Rogerson formed part of the commission under which Shiel and Hinchcliffe gave their depositions at Liverpool in December, 1905; but these interrogatories remained unanswered when the commission was returned, the claimant's solicitors reporting that they had been unable to trace the men. It appears that Wallace was found by the libelants on board the British steamer Dalmally of Liverpool at Mobile early in 1903, and that they obtained an affidavit from him, which is, of course, not before me. It appears, further, that the claimants were notified in April or May, 1903, that the libelants' representative had talked with Wallace in Mobile, but the notice was not given until after he had sailed from that port, for what destination is not stated. From what appears I can draw no inference against the claimant from the fact that they have not taken Wallace's testimony.

After close examination of the claimant's evidence, I have been unable to find in it sufficient ground for the conclusion that the testimony given by the various witnesses who were on board the Ramleh is willfully false. The impression made on my mind by it is that it is honest, and that the witnesses were, as they say, completely surprised when they learned at Liverpool that the charge of collision with a bark had been made against the steamer. Whatever the discrepancies between the two log books, or between either and the statements of any witness, they do not appear to me sufficient to warrant the contrary conclusion. The case made by the libelants' evidence, however

strong in the absence of contradiction, I cannot regard as sufficiently strong to warrant a finding that the contradictory evidence introduced is wholly untrue. My decision must, therefore, be that the burden of proof which rests upon the libelants has not been sustained by a preponderance of evidence such as is requisite for the purpose under the circumstances of this case; and the libel must be dismissed, with costs.