### THE ROMAN PRINCE.

(District Court, E. D. New York. February 8, 1921.)

1. **Collision ⟺122—Evidence to establish.**
   The doctrine of res ipsa loquitur cannot be invoked to establish that an injury to a vessel was caused by collision with another, and the liability inferred, unless there is evidence of some injury inflicted.

2. **Collision ⟺74—Evidence to establish.**
   Evidence, though directly in conflict, *held* sufficient to, establish that a steamship, in passing out of a slip, came in contact with a barge lying outside another at a pier, and her liability for the sinking of the barge, which followed almost immediately afterward, in the absence of any other cause shown.

---

⟺For other cases see same topic & KEY-NUMBER in all Key-Numbered Digests & Indexes

(270 F.)

In Admiralty. Suit for collision by Philip J. Kenny, owner of the barge Crane, against the steamship Roman Prince. Decree for libelant.

Macklin, Brown, Purdy & Van Wyck and Wm. F. Purdy, all of New York City, for libelant.

Kirlin, Woolsey, Campbell, Hickox & Keating and Wm. H. Mc-Grann, all of New York City, for claimant.

CHATFIELD, District Judge. For several days prior to the 19th of April, 1919, the barge Crane had been taking on a cargo of barley at various points in the slip on the south side of Pier 5 of the Bush Stores in Brooklyn. A number of barges were in the slip, when, around noon on that day, representatives of the Prince Line, which loaded its vessels upon the north side of Pier 4, moved some of these barges in order to allow the Roman Prince, which had been loaded to a 26-foot water line, to pass out of the slip to sea. The Prince had been berthed inshore of the steamships Carlow Castle and the Justin, and at the time a lighter was lying on the north side of the Justin. A harbor strike was in progress and no tugs could be procured, so the Prince, with the help of her own power and lines to piers or vessels on either side, started stern first out of the slip at approximately high water slack.

The slip is 275 feet wide. The Roman Prince is a steamer 420 feet long, with 54 feet beam. Her stern was first moved over toward the center of the slip, by hauling with the steamer's winch upon a line to Pier 4. A second line, running to Pier 5, was intended to hold the steamer from moving over, so as to strike the barges on the opposite side, and the steamer progressed by drawing in these lines with her winches until she reached a point near the entrance to the slip. The barges on the north side had been three or more deep, and some had been moved until no more than two abreast were left at any point on the southerly side of Pier 5. On the northerly side of Pier 4, the Justin and the barge alongside of her represented the widest obstruction to the slip. This would leave a clear space of approximately 115 feet through which the Prince could pass, with a clearance on each side of substantially 30 feet, if held to her true course. Apparently there was still some flood tide, although one of the claimant's witnesses testified that the tide was ebb, and at another time that it was flood.

The Prince, after reaching the outer end of the slip, continued backing while turning her stern to port upstream until she reached a position where she could, under her own engines, proceed down the Bay. The engines of the Prince were not used steadily until her stern had nearly reached the end of the slip, although one of the witnesses from the steamship testifies that these engines were worked back and forth at short intervals, as was necessary in getting her out of the slip. The lines to the north and south were cast off before the stern of the Prince emerged from the slip, and it is evident that, in order to allow the vessel to move astern under headway, they must have been run at a considerable angle from the perpendicular, if pulling or warping upon these lines was relied upon to give way to the ship. This would in turn allow considerable movement to either side, and the way of such an im-

mense vessel would have been very difficult to stop, unless the propeller was worked to start and stop her as occasion might be.

An Erie Railroad barge was moored off the outer end of Pier 4. Just inside of the end of Pier 4 on the south side was a Central Railroad barge, and the Crane was moored on the outer or southerly side of the Central Railroad barge. Ahead of the Central Railroad barge was a Lehigh Valley covered barge. One of the witnesses was in the door of this Lehigh Valley barge, while another was seated upon its roof. A third eyewitness was on the end of the pier, where he was waiting while a Shipping Board tug had gone to Pier 3 to dock the Tiger, a United States transport, which was accompanied by a boat with a band welcoming its arrival. Another witness was seated upon the top of the Erie barge, and these men all agree with the testimony of Mrs. Keenan, the wife of the captain of the Crane, that the stern of the Prince, as the vessel came out of the slip slightly on a diagonal toward Pier 4 on the north, struck the Crane a severe blow, at some point aft of amidships on the starboard side.

The Crane had been moored bow in. She was a barge 120 feet in length, with a side of some 12 or 13 feet, and was then loaded so as to draw 10 or 11 feet of water. The witnesses agree that the stern of the Prince then swung off toward the south, and that the Prince continued, as one of them expresses it, "scaling along" the Crane until the bluff of the bow of the Prince swung into the side of the Crane and continued either in contact or close to the starboard side of the Crane until the stern was passed.

The witnesses all agree that the Prince went clear of the outer mouth of the slip before turning stern upstream, and that Mrs. Keenan returned to her cabin, from which she in 5 or 10 minutes emerged and called for help, as her boat was then obviously sinking. The boat became entirely submerged within about 30 minutes after the Prince had passed out, and Mrs. Keenan was with difficulty helped on one of the other barges as the water rose on the Crane. The captain of the Crane had gone ashore for provisions, knew nothing of the occurrence, and was prevented by illness from being present at the trial. Within an hour after the Prince had gone out of the slip, the sinking of the Crane was reported to one of the officials on the dock of the Prince Line, by some one who evidently considered that the Prince Line was interested therein.

During the same afternoon a Merritt & Chapman wrecking boat reached the scene and prepared to remove the cargo of barley. A diver went down and examined the starboard side of the Crane from bow to stern. He could ascertain, by feeling, no injury until he reached the stern, where he found four or five of the end planks, some 3 feet from the bottom of the boat, forced out from the side a distance estimated by him as 5 or 6 inches.

That night another large steamer, the Wabash, came in the slip to load, necessitating the removal of the wrecking apparatus. According to the testimony the Wabash was unable to bring her stern close into the side of Pier 4, because of the wind or from being in contact with

some part of the Crane. The next day the Wabash was pulled ahead and brought alongside the pier, but later was pulled back at high tide and evidently rested, when loaded, upon the Crane as the tide fell. When fully loaded, the assistance of tugs was required to remove the Wabash, and the Crane, when put upon the dry dock, had her bow partly crushed in, her deckhouse, towing bitts, cleats, and upper parts broken down upon her deck, while a large number of her bottom planks were broken and pulled away, and one of her bilge logs was cracked near amidships. The owner of the Crane testifies that this cracked bilge log was on the starboard side of the vessel.

If the Crane was not lying exactly upon an even keel, her wearing strips may not have protected the bilge log if the boat was touched by the side of the Prince, which goes straight down to a much greater depth than the entire draft of the Crane. The sides of the Prince, when examined later, showed no dent or injury fixing any point of contact, and the old, scaly paint upon the Prince bore no marks of a blow or of scraping.

At the trial, examination of the photograph exhibits in evidence made it clear that the end planks of the Crane could not have been forced off by the side of the Prince or by her stem, unless she was listed somewhat to port, for the ends of these planks did not project beyond the side of the boat, and as a wearing strip along the side and around the stern was not injured, although only a couple of feet above the planks which were forced off.

The libelant then made the suggestion that the blade of the propeller of the Prince, which has a circumference of some 18 feet, or even the frame of the rudder, might have struck the stern of the Crane as the Prince was passing by. The Crane was so low in the water that the libelant contended that she could pass under the counter of the Prince far enough to come in contact with the propeller, or even the rudder blade.

But examination of the photographs and of the drawings of the Prince which have been supplied show that the curve of the Prince toward the stern post and her cutaway are not sufficient to allow the Crane to have reached a position where the propeller could have struck the end of the Crane, without placing the Prince at such an angle across the slip as to have brought her in contact with the boats on the southerly side. A number of witnesses who were located at points on the southerly side of the slip have testified that the Prince was at no time near the boats on their side and appeared to pass straight out from the slip, from the time when her stern began to pass the Crane.

No such position could have been assumed by the Prince without having been evident to all the witnesses in the neighborhood, and furthermore, if the Prince had been in such a position, Mrs. Keenan could not have gone outside her cabin and while standing upon the deck called (as she testifies that she did, in which she is corroborated by the other witnesses for the libelant) to an officer in uniform on the after deck of the Prince that the Prince had sunk her boat. These witnesses

corroborated Mrs. Keenan also in her testimony that the officer replied, "All right, lady; we didn't do you any harm."

If the Crane had been so far under the counter as to be able to reach the propeller, the side of the Prince would have been over against the deckhouse of the Crane, and directly over Mrs. Keenan's head. She could not have stood alongside her cabin, and when she called up to the officer she would have been thoroughly impressed with the position of the steamer. Further, the injuries to the Crane could not have been more than 6 or 7 feet under water, and the propeller blades would not describe an arc at that depth sufficient to enable them to reach the side of the Crane, if the boats were passing in any way side by side.

But more conclusive than this testimony as to possibilities is the testimony of Mrs. Keenan and of the witnesses, who all agree that the heavy blow which they saw, heard, and felt occurred when the side of the Prince near the stern struck the Crane amidships, and before the stern of the Prince reached where Mrs. Keenan was standing. It would appear that the blow inflicted by the bow of the Prince, even if that actually came in contact as the witnesses for the libelant testify, was not nearly so severe, and if an injury had been found by the diver at the point amidships of the starboard side of the Crane, where the first contact has been located by the witnesses, this would have been conclusive of the issue of fact in the case in favor of the libelant.

The claimant has produced 14 witnesses, including the pilot, who was on the after bridge of the Prince until she was straight in the slip, and had nearly reached the outer end of the slip when he left to go forward, her officers upon both bridges, her wireless operator, and another man who was sitting upon the port side of the deck watching the vessel pass out of the slip, and others of her crew who were employed in signaling to the engine room, etc., who all testify that the Prince passed the Crane without touching her, and with various amounts of open water (from 5 feet to 50) at all times between the vessels.

The claimant has also produced the man who handled the lines on Pier 4, and another man who carried the lines in a small skiff from point to point along the southerly side of Pier 4. Both of these men testify that they were upon the Crane as the Prince passed by. They also testify that they were talking to Mrs. Keenan at the time, and that the man from the small boat was in her cabin talking with her for several moments after the Prince passed out. This is denied by Mrs. Keenan and all the other witnesses for the libelant, who testify that these men were not upon the Crane at the time of the collision, and that the man with the small boat left and rowed away to where the Tiger was being docked before the stern of the Prince got out of the slip.

We have, therefore, a direct conflict in the recollections and testimony of the witnesses. The claimant contends that, if the Prince is not shown to have touched the Crane, a finding that the sinking of the Crane resulted from the movements of the Prince would be mere speculation. It is argued by the claimant that, even if the Crane sank at a

point of time in conjunction with the passing out of the Prince, the injury might have been received in some unexplained manner at another time, that some obstruction in the slip might have been present and forced by the Prince against the Crane under water, and that there would then be no proof of negligence on the part of the Prince or those responsible for her movements. They also argue that the sinking of the Crane at this time may have been pure coincidence.

[1] The claimant cites the cases of The Charles L. Jeffrey, 55 Fed. 685, 5 C. C. A. 246, The Ramleh (D. C.) 157 Fed. 769, and The Worthington and The Davis (D. C.) 19 Fed. 836, as authority for the proposition that the libelant must prove some fact from which negligence is to be imputed. An unexplained sinking of a vessel might be attributed to the presence of another vessel, where no competent cause can be found from the testimony, but no negligence would be ipso facto made out. The doctrine of res ipsa loquitur can be invoked in such a situation only in case it can be found from the testimony that some contact between or effect upon the vessels resulted from the navigation of the vessel charged with causing the injury. Liability can be based only upon negligence, either proven by direct evidence or by the nature of the act. Mere propinquity of the two vessels does not prove of itself the cause of injury, and certainly does not show negligence if no cause of injury can be found.

[2] But if it be found as a fact that the Prince, with her tremendous mass, was so navigated, either under the influence of her propeller or by pulling upon the lines with sufficient force to set the vessel in motion, and if she came in contact with the side of the Crane and the Crane thereafter sank, either from a broken bilge log and the forcing off of her bottom planks, or in some mysterious way from the forcing out of the end planks, then the claimant would be chargeable with negligence for undertaking such an operation without sufficient precautions, or using sufficient care to prevent the moving of the heavy mass of the Prince against the Crane. Damage would naturally and almost inevitably result if the boats were allowed to touch. This would not be one of the expectable, ordinary contacts incurred when moving in and out of the slip. If contact between the vessels be found as a fact, then the burden is thrown upon the claimant of presenting evidence sufficient to show that the injury was caused by something other than this contact, or that the contact in question could not have produced the injuries found.

There can be no question in this case that the injuries were present before the Wabash came into the slip. In the first place, the Crane sank, and sank rapidly. In the next place, the diver found the planks had been forced off from the end of the Crane before the Wabash arrived. Something must have produced these injuries, and if it be found as a fact that the Prince struck the Crane, this would be sufficient proof of negligence in the handling of the Prince to allow the owner of the Crane to recover for the injuries sustained prior to the arrival of the Wabash, in so far as these can be proven.

The court saw and heard the witnesses for the libelant, most of whom

270 F.—63

were disinterested, and who testified so positively that the Prince did strike a severe blow against the side of the Crane that their testimony must outweigh the greater number of witnesses for the Prince, who either had some interest in the transaction or whose attention may have been diverted at the time. If they did not see the collision, their recollection, when drawn to the matter long afterward, as to whether the boats actually touched, and their estimate of the distance by which the boats were kept apart, is not persuasive. Their estimates of this distance are manifestly at fault, because they disagree widely, and yet the Prince, according to most of them, was much closer to the side of the Crane than the middle of the slip, where she intended to pass out.

It must therefore be held that some collision occurred, and that this was the result of negligence on the part of the Prince. The libelant may have a decree.